[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15254
Non-Argument Calendar
_____

D.C. Docket No. 6:13-cv-01067-GAP-TBS

PUBLIC RISK MANAGEMENT OF FLORIDA,

Plaintiff-Appellant,

versus

ONE BEACON INSURANCE CO.,
a foreign corporation authorized to do business in Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 24, 2014)

Before CARNES, Chief Judge, HULL and FAY, Circuit Judges.

PER CURIAM:

Public Risk Management of Florida appeals the district court's decision to dismiss its complaint with prejudice. Public Risk contends that its complaint stated two claims for relief, one based on breach of contract and one based on equitable estoppel.

I.

This case is a dispute about insurance coverage in an underlying lawsuit. Public Risk is an intergovernmental risk management association that insures various local governmental entities in Florida.[1] See Fla. Stat. § 768.28(16). Public Risk insures itself through a reinsurance policy purchased from OneBeacon Insurance Company. Public Risk has filed a claim with OneBeacon seeking coverage for the legal fees that Public Risk incurred defending one of its members, the City of Wintergarden, in an underlying lawsuit. OneBeacon refuses to pay on that claim because it believes that Public Risk had no duty to defend the City from that suit. We will begin by outlining the facts of that underlying lawsuit because they are necessary to understand the dispute before us.

In 2009 the City reached an agreement with the Florida Department of Transportation (FDOT) to remove the utilities located along State Road 50 so that the FDOT could widen and improve the road. Under the agreement, the City

---

[1] Because Public Risk challenges the Rule 12(b)(6) dismissal of its complaint, we take these facts from Public Risk's complaint, accepting its account as true and construing its facts in the light most favorable to Public Risk, see Doe v. Pryor, 344 F.3d 1282, 1284 (11th Cir. 2003).

would remove all of the City-owned utilities, and the FDOT would — before the City's removal began — remove all of the non-City-owned utilities. The City solicited bids on the job and awarded the contract to Dewitt Excavating, Inc. The contract called for Dewitt to complete the job in 240 days and included a liquidated damages clause that required Dewitt to pay the City $5,000 for each extra day it took to finish the project. The contract softened that deadline by allowing for "equitable extensions" in the event that outside forces delayed, disrupted, or complicated Dewitt's work. Dewitt entered its bid and agreed to the contract based largely on two representations by the City: (1) the project drawings that the City provided to all the bidding contractors, which identified the location of the utilities that Dewitt would have to move; and (2) "Addendum No. 1" to the City's request for bid proposals, which informed the bidders that the FDOT would remove the non-City-owned utilities by January 23, 2010. Dewitt used that information to estimate how much time and money it would take to finish the project, as well as to plan where to dig.

Once the work began, Dewitt ran into significant delays. The biggest problem was that there were far more utilities along the road than the City had indicated. The FDOT failed to move the non-City-owned utilities that it had agreed to handle under its agreement with the City, and Dewitt found many unknown or unidentified utilities that did not appear on the project drawings.

3

Dewitt damaged some of those utilities when it dug into what it thought was empty ground. On top of that, the City made numerous revisions to its plan that required Dewitt to perform extra work and incur extra costs that had not been part of its original bid. Although the City initially granted several of Dewitt's early requests for equitable extensions, it refused to grant further extensions as the deadline neared and threatened to seek both liquidated and actual damages if Dewitt did not meet the deadline. Dewitt tried to finish on time, but the logistical problems were too much to overcome and the project ran past the deadline. After the work was complete, the City refused to pay Dewitt for pending change orders and other amounts under the contract, asserting that Dewitt was liable for liquidated and actual delay damages.

Dewitt sued the City in state court in June 2011. Its complaint organized Dewitt's claims into two general counts, one for breach of contract and one for violation of Florida's Public Records Act. This appeal concerns Count One, which was for breach of contract.[2] It alleged, among other things, that the City's project drawings omitted some utilities, and that the City knew the non-City-owned utilities would not be removed in the timeframe presented in Addendum No. 1. Count One claimed that the City had breached its contract with Dewitt in eleven

---

[2] Count Two was based on the City's refusal to honor a public records request that Dewitt made in May 2011 in an attempt to acquire documents regarding the City's contract with Dewitt. Public Risk concedes that Count Two does not trigger the duty to defend because the City's policy covers only claims for money damages, and Count Two seeks equitable relief.

4

different ways, identifying the different theories of breach as "26(a)" through "26(k)." The first two theories faulted the City for the errors and omissions in the project drawings and the false information in Addendum No. 1. Paragraph 26(a) alleged that the City "breach[ed] its implied warranty that the plans and design specifications issued to Dewitt were accurate and suitable for performing Dewitt's scope of work." And Paragraph 26(b) alleged that the City "breach[ed] its implied obligation not to furnish misleading information." The remaining nine theories focused on the City's conduct after the work had begun, such as "refusing without valid justification to pay change orders and pay applications" and "failing to respond to or pay various written requests for payment." Based on those eleven theories of breach, Count One sought eleven categories of damages from the City, which the complaint identified as "27(a)" through "27(k)." Many of them were based on payments the City owed Dewitt under the contract, but two were tied to the inaccuracies in the City's project drawings and the misstatement in Addendum No. 1. Paragraph 27(f) sought "[a]mounts Dewitt is and/or becomes obligated to pay owners of utilities that were damaged as a result of the City's misrepresentations, erroneous design specifications, and/or refusal to grant warranted time extensions." And Paragraph 27(h) sought "[o]ther expenses and damages associated with the reduction in Dewitt's expected productivity as a result of the City's misrepresentations and inaccuracies in the bid package . . . ."

5

Public Risk concluded that Dewitt's allegations could be covered by the provision in the City's policy insuring against "wrongful acts" by the City's officials. That triggered Public Risk's duty to defend under the policy, so it hired a law firm to represent the City.[3] Shortly after Public Risk decided that it had a duty to defend the City, it submitted a claim to OneBeacon for coverage under the reinsurance policy. On June 24, 2011, Public Risk sent OneBeacon a claim letter and a copy of Dewitt's complaint. OneBeacon responded by letter on June 29. It concluded that: "There is no coverage for [Dewitt's suit] as it is currently pled." Public Risk asked OneBeacon to revisit its coverage analysis and proceed under a full reservation of rights.[4] On September 22, 2011, OneBeacon sent Public Risk a supplemental letter doing that. The letter made clear that OneBeacon did so "without conceding that there is at present any potential coverage under the [reinsurance policy] and without waiving any of its rights, including the right to deny coverage for the Dewitt Action in its entirety."

Dewitt's case was settled before trial for $1.35 million. Public Risk did not pay any of that settlement figure, but it did owe $486,941.07 in legal fees to the

---

[3] The City's policy creates a general duty to defend for Public Risk. The policy states: "It is understood and agreed [Public Risk] has the right and duty to investigate, handle, settle, or defend any claim, proceeding, or suit against the [City] or against any person or organization for whom the [City] is or may be found to be legally liable." (capitalization omitted).

[4] A reservation of rights is "[a] notice of an insurer's intention not to waive its contractual rights to contest coverage or to apply an exclusion that negates an insured's claim." Black's Law Dictionary (9th ed. 2009), available at Westlaw BLACKS.

law firm representing the City.  The reinsurance policy obligated OneBeacon to pay the legal fees that Public Risk incurred defending the City in legal actions covered by its policy with Public Risk, subject to a $200,000 self-insured retention.[5]  But when Public Risk sought $286,941.07 from OneBeacon, the reinsurer refused to pay.

Public Risk filed suit in state court in June 2013, asserting claims for breach of contract and equitable estoppel.  OneBeacon removed the case to federal district court under 28 U.S.C. § 1441 and shortly thereafter moved to dismiss the complaint under Rule 12(b)(6) for failure to state a claim.  The court granted the motion and dismissed the complaint with prejudice in October 2012.  Public Risk filed a motion for reconsideration, which the court denied.  This is Public Risk's appeal.

## II.

Public Risk challenges the district court's decision to dismiss its breach of contract claim.  The district court did so after concluding that:  (1) Dewitt's complaint did not fall under the policy's coverage for "wrongful acts," and (2) the policy's exclusion for any "[l]oss arising out of an intentional breach of contract"

---

[5] A self-insured retention is "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu[ally] must be paid before the insurer will pay benefits."  Black's Law Dictionary (9th ed. 2009), available at Westlaw BLACKS.

7

eliminated Public Risk's duty to defend. Our review is de novo. James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1273–74 (11th Cir. 2008).

This challenge turns on whether Dewitt's complaint triggered Public Risk's duty to defend under the City's policy with Public Risk.[6] Our analysis focuses on the language of two documents: the City's insurance policy and Dewitt's complaint. Under Florida law, we must construe the terms of the City's policy based on their plain meaning, resolving any ambiguities in favor of the insured. Id. at 1274. So if a term is ambiguous — if it is susceptible to multiple reasonable interpretations — courts choose the interpretation that favors coverage. Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). When discerning the meaning of a term, courts must be sure to read the "policy as a whole, endeavoring to give every provision its full meaning and operative effect." U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007) (quotation marks omitted). Our assessment of Public Risk's duty to defend in the underlying suit is also focused on text — the text of Dewitt's complaint. Because the duty to defend in Florida is broader than the duty to indemnify, insurers "must defend when the complaint alleges facts which fairly and potentially bring the suit within policy coverage." Lime Tree Vill. Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co., 980 F.2d

---

[6] The district court's opinion observed that "[t]he parties appear to be in agreement that if [Public Risk] had no duty to defend under the [City's] Policy, then OneBeacon had no duty to reimburse [Public Risk]." Neither party disputes that characterization on appeal.

8

1402, 1405 (11th Cir. 1993) (emphasis added).  That holds true even where "the complaint alleges facts partially within and partially outside the scope of coverage," or when "the later true facts show there is no coverage."  Trizec Props., Inc. v. Biltmore Constr. Co., Inc., 767 F.2d 810, 811 (11th Cir. 1985).  Courts therefore focus "solely on the facts and legal theories alleged in the pleadings and claims against the insured," asking whether those allegations arguably fall under the policy's coverage.  James River Ins. Co., 540 F.3d at 1275.  "If the allegations of the complaint leave any doubt as to the duty to defend, the question must be resolved in favor of the insured."  Lime Tree Vill. Cmty. Club Ass'n, Inc., 980 F.2d at 1405.

We begin with the language of the coverage provisions at issue.  Public Risk argues that it had a duty to defend based on Section IV of the policy's primary coverage, which provides coverage for "wrongful acts" by City officials.  Under Section IV, Public Risk "agrees, subject to the Coverage Document limitations, exclusions, terms and conditions to pay on behalf of the [City] for all sums which the [City] is legally liable by reason of a wrongful act."  (capitalization omitted).  Paragraph 23 of the policy's general coverage provisions defines a wrongful act as "any actual or alleged error or miss-statement [sic], omission, act or neglect or breach of duty due to misfeasance, malfeasance, and non-feasance . . . by the [City]."  (capitalization omitted).  Nothing in the City's policy suggests that a

9

wrongful act cannot be rooted in a duty the City has under a contract. To the contrary, the fact that Paragraph (l) in Section IV's exclusions eliminates coverage for "[l]oss arising out of an intentional breach of contract" establishes that unintentional breaches of contract can be covered. Reading the definition of wrongful act as not including breaches of contractual duties would render Paragraph (l) superfluous, which would contradict our obligation "to give every provision its full meaning and operative effect." U.S. Fire Ins. Co., 979 So. 2d at 877 (quotation marks omitted).

When we consider Dewitt's complaint in light of those policy provisions, it is clear that its first two theories of breach "fairly and potentially bring the suit within policy coverage" because those theories allege breaches of contract based on the City's mistakes, misstatements, or omissions. See Lime Tree Vill. Cmty. Club Ass'n, Inc., 980 F.2d at 1405. Paragraph 26(a) asserted that the City "breach[ed] its implied warranty that the plans and design specifications issued to Dewitt were accurate and suitable for performing Dewitt's scope of work." And Paragraph 26(b) asserted that the City "breach[ed] its implied obligation not to furnish misleading information." The same can be said for the two categories of damages in Paragraphs 27(f) and 27(h), which sought money "to pay owners of utilities that were damaged as a result of the City's misrepresentations" and for "[o]ther expenses and damages associated with the reduction in Dewitt's expected

10

productivity as a result of the City's misrepresentations and inaccuracies in the bid package." Because those portions of Dewitt's complaint assert that the City is liable for mistakes or omissions in drafting the project drawings and misstatements in Addendum No. 1, they arguably fall under the coverage provision for wrongful acts, which is enough to trigger Public Risk's duty to defend. See id.

The district court reached a different conclusion. Its first basis for concluding that Public Risk had no duty to defend was its determination that Dewitt's complaint had not alleged a theory of liability based on a wrongful act. The court declared that it would assess Public Risk's duty to defend by analyzing "the Dewitt Complaint taken as a whole." It then reasoned that:

> The Dewitt Complaint makes clear that the asserted basis for money damages was Winter Garden not paying what it allegedly owed under the terms of the Construction Contract. As such, there was no allegation of any purported wrongful acts by Winter Garden officials that gave rise to the Dewitt Action—the Construction Contract was the reason Winter Garden was obligated to pay Dewitt.

The district court never specifically addressed the four paragraphs from the complaint discussed above — none of which are based on the City's refusal to make payments.

The district court's reductive "as a whole" analysis has no support under Florida law and is contrary to this Court's binding precedent. In Lime Tree Village, we held that insurers have a duty to defend under Florida law where some of the complaint's allegations trigger the duty to defend and some are excluded.

11

See 980 F.2d at 1405–06.  OneBeacon attempts to distinguish Lime Tree Village on the grounds that it involved two suits bringing eleven separate counts, while Dewitt's complaint brought all of its breach of contract claims under one count. See id. at 1405 ("This is not a case where there is a single cause of action based wholly on acts expressly excluded by the policy.").  But that mathematical distinction makes no jurisprudential difference.  Nothing in Lime Tree Village suggests that the duty to defend is so formalistic that an allegation cannot trigger the duty unless it is brought under a separately headed count that segregates it from allegations not covered by the policy.  In fact, Lime Tree Village rejected an argument very similar to OneBeacon's.  The insurance policy at issue there excluded coverage for intentional acts.  Id. at 1404.  The defendant argued that all the plaintiffs' counts were excluded because every count incorporated by reference all of the complaint's factual allegations, and the allegations included intentional acts.  Id. at 1405.  We rejected that argument because all that mattered under Florida law was that some of the factual allegations set forth unintentional acts. See id.

Furthermore, Florida law imposes a duty to defend whenever "the underlying facts contained in the complaint can be fairly read to support a claim covered by the indemnification provision."  Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233, 1261 (11th Cir. 2002) (emphasis

12

added) (citing Metro. Dade Cnty. v. CBM Indus. of Minn., Inc., 776 So.2d 937, 938 (Fla. 3d DCA 2001)).  The eleven theories of breach that Dewitt's complaint alleges can be fairly read as effectively raising eleven distinct claims.  Paragraphs 26(a) and 26(b) assert liability based on factual allegations that fall under the policy's coverage for wrongful acts.  That triggers the duty to defend regardless of whether Paragraphs 26(c) through 26(k) rely on facts that fall outside the policy's coverage.

The district court also relied on an exclusion clause in the City's policy.  It concluded that Dewitt's complaint was not covered because Paragraph (l) of Section IV excluded coverage for "[l]oss arising out of an intentional breach of contract."  We disagree.  In Florida, "exclusionary clauses are construed even more strictly against the insurer than coverage clauses."  Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000).  OneBeacon thus "has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation."  Hartford Acc. & Indem. Co. v. Beaver, 466 F.3d 1289, 1296 (11th Cir. 2006) (quotation marks omitted).  It has not met that burden.

OneBeacon argues that Paragraph (l)'s use of the phrase "arising out of" — which is a term of art in Florida insurance law meaning "originating from" or "growing out of" — makes the exclusion broad enough to exclude coverage here.

13

See James River Ins. Co., 540 F.3d at 1275 (quotation marks omitted).  But that argument overlooks the fact that Paragraph (l) excludes coverage for "loss" as opposed to coverage for "claims."[7]  Florida insurance law distinguishes claims from losses — the former being the suits themselves, and the latter being the damages that are assessed.  That is why an insurer can be obligated to defend against a claim even if it is not ultimately obligated to pay for the losses arising from that claim.  See Allstate Ins. Co. v. Ginsberg, 863 So. 2d 156, 163 n.4 (Fla. 2003) ("An insurer's duty to defend is broader than the duty to pay or indemnify and it involves distinct responsibilities beyond the coverage issues.").  So the only way that Paragraph (l) could negate OneBeacon's duty to defend here is if all of

---

[7] Nine of the exclusions in Section IV exclude coverage for claims.  For example, Paragraph (j) excludes coverage for "[a]ny claim based upon or attributable to any failure or omission of the [City] to effect or maintain coverage of any kind."  (capitalization omitted and emphasis added).  Paragraph (l)'s contrasting use of the term "loss" implies that it has a different scope than the exclusions that use the term "claim."  Cf. State v. Mark Marks, P.A., 698 So. 2d 533, 541 (Fla. 1997) ("The legislative use of different terms in different portions of the same statute is strong evidence that different meanings were intended.") (quotation marks omitted).

The policy's own definitions reinforce the distinction.  Section IV defines "claim" to mean "all notices or suits demanding payment of money, or charges filed with the Equal Employment Opportunity Commission or comparable State agency based on, or arising out of the same wrongful act or a series of related wrongful acts by one or more assureds."  (capitalization omitted).  While the City's policy does not define the term "loss," it does define "ultimate net loss" to mean "the total sum which the [City] is obligated to pay because of loss or damage covered under any Section of this Coverage Document, either through adjudication or compromise, after making proper deductions for all recoveries and salvages."  So the policy uses "claim" to refer to suits, which implicate the duty to defend, and uses "loss" to refer to damages, which implicate the duty to indemnify.

14

the losses sought in Dewitt's complaint grew out of an intentional breach.[8]  If some

of the alleged losses could be independent of the alleged intentional breach, the

duty to defend would still exist.[9]

Four paragraphs in the complaint extend beyond the scope of Paragraph (l).

Paragraphs 26(a) and 26(b) fall outside its scope because they claim the City made

mistakes in the project drawings and a misstatement in Addendum No. 1, not that

the City intentionally breached the contract.  Likewise, Paragraphs 27(f) and 27(h)

seek damages that do not depend on or relate to any intentional breach of the

contract.  Paragraph 27(f) seeks money for "[a]mounts Dewitt is and/or becomes

obligated to pay owners of utilities that were damaged as a result of the City's

misrepresentations, erroneous design specifications, and/or refusal to grant

warranted time extensions."  Similarly, Paragraph 27(h) seeks money for "[o]ther

expenses and damages associated with the reduction in Dewitt's expected

---

[8] We have our doubts about whether Paragraph (l) can ever negate the duty to defend because we find no language in the policy that suggests the duty to defend depends on the damages a claim seeks.  The policy simply states that OneBeacon has a duty to defend against "any claim, proceeding, or suit against the [City] or against any person or organization for whom the [City] is or may be found to be legally liable."  (capitalization omitted).  The use of "any claim" implies that the duty to defend will apply unless there is an exclusion for that particular kind of claim (as opposed to that kind of loss).  But the City does not raise that argument, and both sides' briefs assume that Paragraph (l) can exclude coverage for some claims.  So we will assume it as well since it does not affect the outcome here.

[9] The distinction between coverage for claims and coverage for loss means that OneBeacon's heavy reliance on Transamerica Insurance Co. v. Snell is misplaced.   See 627 So. 2d 1275 (Fla. 1st DCA 1993).  The exclusion provision in Snell applied to "[a]ny claim arising out of insolvency, receivership, or bankruptcy."  Id. at 1276 (emphasis added).  The court did not address whether an exclusion limited to "loss" can negate the duty to defend against claims.

15

productivity as a result of the City's misrepresentations and inaccuracies in the bid package . . . ."[10]  The money Dewitt had to pay those utility owners, as well the dip in productivity it suffered, had nothing to do with the City's decision to withhold the payments that it owed Dewitt.  So those four paragraphs, in concert, seek out damages that do not entirely depend on, originate from, or relate to an intentional breach by the City, which means they cannot be excluded by Paragraph (l). OneBeacon does not point to any provision in the City's insurance policy or the contract that establishes otherwise.

## III.

Public Risk also contends the district court erred in dismissing its equitable estoppel claim.  That claim alleged that OneBeacon's letters on June 29 and

---

[10] It might be argued that some of the damages sought by Paragraphs 27(f) and 27(h) were losses excluded by Paragraph (l).  In full, Paragraph 27(f) sought:

> Amounts Dewitt is and/or becomes obligated to pay owners of utilities that were damaged as a result of the City's misrepresentations, erroneous design specifications, and/or refusal to grant warranted time extensions.

(emphasis added).  Similarly, Paragraph 27(h) sought:

> Other expenses and damages associated with the reduction in Dewitt's expected productivity as a result of the City's misrepresentations and inaccuracies in the bid package, the City's active interference with Dewitt's work, and the City's knowing failure to cooperate in good faith in resolving hindrances within its control."

(emphasis added).  But even if the emphasized clauses of each paragraph were damages arising out of intentional breach, all that matters in terms of the duty to defend is that part of each paragraph raises allegations that fall outside the scope of Paragraph (l)'s exclusion.  See Hartford Acc. & Indem. Co., 466 F.3d at 1296.  The allegation of "erroneous design specifications" in Paragraph 27(f) and the allegation of "inaccuracies in the bid package" in Paragraph 27(f) are outside the Paragraph (l) exclusion.

16

September 22 indicated that Public Risk had a duty to defend the City, and that Public Risk relied on those representations to its detriment. This contention is frivolous. Under Florida law, every estoppel claim must assert, among other things, that the defendant made "a representation as to a material fact that is contrary to a later-asserted position." State v. Harris, 881 So. 2d 1079, 1084 (Fla. 2004).[11] Nothing in either letter is contrary to a position that OneBeacon asserted later. Both letters make clear from their beginnings that OneBeacon did not believe the City's policy covered Dewitt's claims. The first paragraph of the June 29 letter says — point blank — "There is no coverage for [Dewitt's suit] as it is currently pled." And the first paragraph of the September 22 letter announces that it will discuss the general terms of the City's policy "without conceding that there is at present any potential coverage under the [reinsurance policy]." Public Risk's complaint does not identify an instance in which OneBeacon wavered from that position.

Instead, by taking several portions of the September 22 letter out of context and mischaracterizing them, the complaint tries to create the impression that OneBeacon changed positions. For example, the September 22 letter says: "OneBeacon understands that Public Risk Management of Florida ('PRM')

---

[11] For claims such as Public Risk's, where promissory estoppel is being "utilized to create insurance coverage," Florida law requires the plaintiff to go even further and show that refusing to find coverage "would sanction fraud or other injustice." Crown Life Ins. Co. v. McBride, 517 So. 2d 660, 662 (Fla. 1987).

17

contends that Paragraphs 19 and 24 of the DeWitt Action complaint create a small sliver of potential coverage that at least triggers PRM's duty to defend." Public Risk tries to claim that this sentence, which merely acknowledges Public Risk's position, is an affirmative statement by OneBeacon that Public Risk does in fact have a duty to defend. Allegations based on obvious misreadings of OneBeacon's letters do not satisfy Rule 12(b)(6)'s "facial plausibility" standard. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009).

IV.

The district court's judgment is reversed as to Public Risk's breach of contract claim and affirmed as to its promissory estoppel claim.

**AFFIRMED in part; REVERSED in part.**

18